Thank you, your honor. Virginia Mason does not dispute that its plan violates the Medicare Secondary Payer Act's prohibition on taking into account that an individual is eligible for Medicare benefits. Unlike Amy's Kitchen, they made the mistake of saying the quiet part out loud, explicitly saying in the plan that reimbursement for dialysis will be drastically reduced in the words of the plan, quote, once the member is eligible to become qualified for Medicare coverage for ESRD, unquote. That's excerpt of record page 84. Virginia Mason argues that it is unlawful plan provision is not actionable because the MSP private right of action is unavailable unless Medicare steps in and pays instead. I have three points in response. First, both the statute's text and its regulatory history history make clear that DaVita has a cause of action regardless of whether Medicare pays. The plan's interpretation would make the statute virtually a dead letter that could be used, couldn't be used, except when the government mistakenly made a payment. Secondly, even if the statute did require Medicare to pay, that's exactly what happened here. Medicare paid because Virginia Mason forced patient one off its plan 20 months into the coordination period. Finally, third, it is overwhelmingly clear that Virginia Mason violated the MSP when it changed its terms to reduce benefits for Medicare eligible patients alone. Virginia Mason doesn't dispute that nor could it. Although the district court did not address this issue, this court should reach the issue on appeal and resolve in DaVita's favor. So to begin, the MSP Act's broad cause of action says literally nothing about anyone else needing to pay before a cause of action arises and nothing about Medicare, period. Instead, it only speaks about what the plan must do to trigger the cause of action, namely fail to provide for primary payment or appropriate reimbursement. I'll get to the cross-reference in just a second. It would be very unusual to prevent a party from suing for injury to itself until a third party suffers injury and the plan identifies no other statute that works that way. Now the plan says that Congress smuggled that requirement of payment into the statute through an oblique cross-reference. The statute speaks of the primary plan failing to provide primary payment in accordance with paragraphs 1 and 2a, but the text and the regulatory history just won't support that reading. First, the plan gives no explanation why Congress would impose such a basic limitation, basically adding an entirely new element to the cause of action through a passing cross-reference rather than explicitly requiring that Medicare have made payment. The saying goes Congress doesn't hide elephants in mouse holes. If Congress wanted to make a cause of action conditional on Medicare making payment, it knew how to do that. After all, just two years earlier in a neighboring provision that gave the government a cause of action, it limited it to recovering payment made by the United States and the fact that Congress used different language suggested it had different meanings in those two places. They never explained why Congress was so explicit in one and so indirect in the other. Second, the cross-references undercut the plan's meaning and make clear that the plan's preferred reading would make the statute essentially a dead letter. First, paragraph 1, the cross-reference to paragraph 1 sets forth the anti-differentiation and take into account provisions. I think the argument is that paragraph 2 must be a reference to Medicare making payment, but paragraph 2A doesn't permit Medicare to make payments. As the plan itself concedes on page 27 of its brief, paragraph 2A prohibits Medicare from making payment when the plan is supposed to pay. It's not until paragraph 2B, which isn't part of the cross-reference, the statute authorizes Medicare to make conditional payments under limited circumstances that aren't present here. Thus, according to the plan, Congress improbably created a private right of action but conditioned it on Medicare making payment and then it prohibited Medicare from making payment. The plan's interpretation means that Congress passed a law that literally does nothing except perhaps when Medicare mistakenly makes payments and under those the statute would essentially be a dead letter. But as the Supreme Court has observed in the case I referenced in the last argument, courts should not give statutes an interpretation that gives them only limited effect. That's the Nijewan v. Holder case we cited in our brief. Finally, the regulatory history of the statute or the regulatory history of the agency's implementation of the statute forecloses the plan's argument. And this again refers to the regulation or the argument 54 Federal Register 41718. I encourage you if you haven't done so already to print it out and read the center column. During rulemaking to implement 1984 amendments to the MSP provision, commenters said that Medicare should be authorized to make conditional payments when a group health plan that is primary refuses to make payments. And the agency refused saying that Medicare should not pay when it is reasonable to expect an employer group health plan to play. And they said it is reasonable to expect the plan to comply with the law. Rather, and this is the part that I read off the Federal Register during the last argument, when the agency explained that it is the provider's responsibility to pursue complexion from a plan when it doesn't make payment. That is exactly what we're doing here today. Nothing in that entire discussion, 54 Federal Register 41718 says anything about Medicare having to pay before we could ever go into court and pursue our rights. There was no cause for concern, the agency explained at the time that it issued the regulation, because Congress had created a private right of action with double damages if a responsible third party fails to pay for primary benefits. Again, said nothing at all about Medicare stepping in first. That contemporary agency regulation is entitled to great weight. I have one question about another issue in the case, if I may. And that is the question of exhaustion of administrative remedies. There are no ERISA claims in this case, as I understand it, because there was no exhaustion. Would the claim fail for that reason? No, Your Honor, we are bringing these straight under the Medicare Secondary Payer Act. There's no exhaustion requirement under that act. There's no language in MSP requiring exhaustion. And I think that it is, it's just not serious that, you know, after they adopt a plan, just so they can give us this lower rate that we have to ask them pretty please, before we can pursue the action. Again, there's nothing in the statute, there's nothing in the regulatory history to suggest there's any sort of exhaustion of remedies angle. Secondly, as I said, even if there were some requirement that we, that Medicare have to make payment, Medicare did make payment here. After 20 months, and this is the danger both here and in Amy's Kitchen, when you give lower benefits and you subject people to balanced billing, which is a legal injury under Springer versus Cleveland Clinic, just being on the hook for that is a legal injury. When you subject people to balanced billing, people don't want to be on the hook for payment. And it puts pressure on them to go on to Medicare so they can avoid that. And that's exactly what happened here. After 20 months, they said, phooey on this, they're going on to Medicare. And that is a real harm. Because Medicare, not only your family can't follow you on to Medicare, Medicare also doesn't cover a lot of other things that are comorbidities for end-stage renal disease, like vision problems. It doesn't cover eye classes, it doesn't cover certain types of vision care. And that is a real hardship for these patients. In addition, Medicare, it may have low rates. That is, they may have imposed low rates on dialysis providers and others. But there's a 20% copay, and 20% of essentially $300 per treatment is a real hardship on patients, many of whom are vulnerable, many are minorities, many are poor. And to require them to pay 20% time and time again is a real hardship on them. And indeed, they may skip treatment simply because it's too much to afford. The other side doesn't really come up with any argument. The court below said that, well, after it switched to Medicare, then Medicare was primary, and so there was no cause of action. But by statute, the private plan is supposed to be primary payer for the entire 30-month coordination period. And essentially, the lower court's reading would render this a nullity, and that the claim would either be too late, and that Medicare hadn't paid yet, or too early because Medicare hadn't paid, or too late because Medicare had stepped in. And I think that that's just not a plausible way of reading the statute. And then finally, we'd urge the court to hold that the plan violated both of the MSP's anti-discrimination prohibitions. We set forth in the opening why they had violated both of them. They did not seek to address it. Instead, they devoted all of their argument to this atextual argument that Medicare has to make payment before we have a cause of action. And so at this point, I'd say they have forfeited their right to argue that. Because it is beyond any doubt how it would be applied in this case, this court can go ahead and address it, even though the district court did not. That's the Golden Gate Hotel case cited in our brief. And if there are no questions, I'll reserve the remainder of my time for rebuttal. You may do that. And we'll hear next from Ms. Drummey. Good morning, your honors. I'm here on behalf of Virginia Mason Medical Center, a sponsor for the plan that's a question in this instant case. Virginia Mason, as a sponsor for this plan, is a nonprofit entity. And it has responsibility under its plan for taking care of a variety of patients. Some with very severe kinds of situations, such as cancer patients. And it has a responsibility in its mission and as an ERISA plan to assure that it is able to try to regarding ESRD patients come in view of enormous efforts across the country to try to deal with very, very high costs from dialysis providers such as DaVita. And DaVita claims that its mission, and we don't dispute, is to provide good services to dialysis patients. But it also is a for-profit entity and has created a very profitable business for it. The plan that is in question here has provisions regarding ESRD patients. And it does talk about situations where Medicare eligibility or Medicare entitlement is involved. We disagree with Mr. Elwood's characterization that we have waived any argument that those provisions violate the taking into account or the differentiation provisions. Council, the way the case is teed up for us, would we even reach that question? In other words, if we were to conclude that there is a cause of action, why wouldn't it simply be sent back for further proceedings? I mean, we have, I suppose, the discretion to go further, but we don't have to, do we? No, we don't, Your Honor. But I think that I wanted to tee up some context for you in this particular matter. But turning to the Medicare statute at issue here, the reason I'm asking you is that at least on first read, I am not persuaded that the plan is neutral with respect to Medicare eligibility. But it seems to me that that's not relevant, whether it's a violation or not a violation. That's not relevant to the question of whether an action is available as a theoretical matter. Very good, Your Honor. The district court below, based on a very well-reasoned decision, examined the case law of various cases involving the Medicare secondary pay or a private cause of action. The statute in itself has two conditions that must be met in order to bring a private cause of action. One concerns the group health plan requirements that appear in paragraph one that talk about taking into account and differentiation of benefits. It also includes reference to paragraph 2A that talks about Medicare shall not make a payment. The whole intent of the act is to prevent Medicare having to step in and make a payment. And that's been recognized by cases across the country. But I don't see, if I can interrupt, but I don't see that that gets you where you, that by itself gets you where you need to get, which is to say your argument is there's no private cause of action until Medicare has paid. I understand that there are a lot of circuits that go your way. And the statute is, I'll say it this way, complex and written in a way that, to Mr. Elwood's point in the prior case, this is not the easiest statute in the world to understand. But it seems a little odd that there should be a requirement before a cause of action lies that well, let me point you to, as we mentioned in our briefs, Mr. Elwood has often focused on 1989 rulemakings and other older materials, but the VEDA has largely ignored the clarifications that the Medicare program provides in its Medicare secondary payor manual. And if you turn to the Medicare secondary payor manual, you will see the Medicare program's interpretation of what happened with regard to what's a non-conformance with the group health plan requirements. And in section 80, for example, of the manual, it talks about the differentiation and taking into account provisions being violated when they result in a Medicare payment, a mistaken Medicare primary payment. And let me tell you, just for context, how that might happen, because the VEDA takes the position that you can't have a Medicare primary payment that's mistaken. I signed up for Medicare, part A, and went to a doctor and got a bill where the provider had billed Medicare, even though I was a group health plan member, for a part B situation, a doctor visit. Medicare caught the error and denied it and sent it back in an explanation of benefits. The provider got that, I got that. So I knew that a mistaken claim had been sent to Medicare. Medicare doesn't catch all those situations. There can absolutely be a situation where Medicare makes a mistaken primary or secondary payment. And in section 80, government realizes that you need to run the filter of whether or not there's been the alleged discriminatory problem through whether or not Medicare has been called in. You're interpreting, excuse me, counsel, your interpretation, though, leaves an enormous hole. If Medicare is careful in making payments only where they're due, which they are probably more often than not, and if a plan violates the statute by differentiating and giving less or more to Medicare patients, then there's no remedy, it sounds like, in your view, and no incentive to pursue the other statutory purpose of creating equal treatment between Medicare patients and other patients. So what would be the recourse, in your view, in that situation? Well, actually, my point, just to bring that point to closure, was that Medicare does make But they make them often, but probably not most of the time. So my question stands, even if you have to assume that there are times when they don't make mistakes, and a plan is discriminatory in violation of the law, what is the effective remedy that's available in your view? There are a number of remedies that are available to the patient and to the place. For example, under the ESRD language of the benefit, the program said that the minimum amount that it would pay would be 125% of the Medicare rate, but said that was the minimum. You have the opportunity, patient or contractor, to come in and ask us for more, because our goal as a plan is to assure that all medically necessary services are available, and if we have to pay more, we will definitely consider that, because that is our end goal. Nothing of that sort was implemented in this case by DaVita or the patient. Rather, what happened is DaVita billed and accepted the contract rate of 125% of Medicare, and did no further following up of any appeal, which it claims it has under the assignment, the exercise of the patient's appeal rights, no request for a higher payment, nothing. The private cause of action is viewed as an extraordinary remedy in the context of the Medicare statute, because it does require it. Why do you say that? Congress either does or does not provide a private right of action. When it does, it does, and when it doesn't, it doesn't. I don't understand why it would be called extraordinary when it makes the decision to do it. Well, extraordinary in the sense that it would require a Medicare payment. It would require Medicare to come in and step in and verify, counter all of the purpose of the Medicare Secondary Payor Act, particularly where patients under ERISA, and this is an ERISA plan, would have a variety of avenues to complain. Page one of the plan identifies to the beneficiary all of the different remedies it feels there's been discrimination against them in any form. It references to the Office of Civil Rights. It referenced to the internal plan provisions. There are a lot of remedies that are not exercised. So the private cause of action, we believe, relates to that particular situation where Medicare has to step in as well and foot the bill. Page two of the plan. We also note that the beneficiary in this case is alleged to have been switched to Medicare because of all the threatened problems hanging over the head of the patient. I found this situation really puzzling. Here we have a situation where DeVita has sat and accepted payments for 20 percent Medicare rate and thereby increased the alleged horrible threat of balance billing to 1.7 million, despite its mentioning in prior briefing that the intent of the private cause of action was to permit immediate action by the provider or the patient to head off this kind of alleged discriminatory behavior before it became a problem and to get the benefits for the patient. Instead, what happened, DeVita accepted the money that was paid and didn't ask for more and let the amount ride to $1.7 million and then claimed, oh, look, the patient must have switched because of the pending balance billing and the like and gone to Medicare. Well, the patient, after a month or two or three, I think would have seen, if that was a true threat to it, that huge amounts were accumulating and would have rationally asked for relief, which it did not do, would rationally have thought about Medicare sooner. And for DeVita to say that the only conclusion that one can reach for why that patient switched to Medicare is because of the plans, activities, and these balance billing threats also doesn't make a lot of sense. This is an ESRD patient. They're not well. They're having a lot of time spent in dialysis. They're Medicare, and they are thinking likely of retirement. They're thinking about, what will my premiums be? Things like many other kinds of things that could be going on here. So the injury to the patient and the injury to the plan are pretty much self-generated by working on its arms and not trying to use any of the other available methods of getting relief. We also note that the district court decided based on the Medicare payment necessity. It did not reach the standing issue. It felt it did not need to. It did not reach a lot of the other presented. But we have noted and note again that we think the Article 3 standing requirements are not met here. The type of threatened problem that the $1.7 million of non-billed balance billing presents is not an imminent threat because they never billed it. They never threatened to bill it. And as unique briefs have provided, they don't bill it. So it is hard for that to be considered an imminent threat. And we offer to you that we think Article 3 standing is missing in this case. With regard to any other questions that you might have, again, we offer that the Medicare secondary payor provisions in the manual offer a much more up-to-date view of CMS's notion that that they offer the notion that providers and beneficiaries would be expected to exhaust all collection kinds of activities that were available to them. To the extent it is at all relevant here, the 1989 has been superseded by the 2005 Medicare secondary payor manual provisions. But in any event, the real thing that CMS was telling providers there is you have to go pursue collection proceedings. We want you to take care of the problem without Medicare having to get involved or without there being a danger of Medicare having to be involved. So we offer here DVTA did not do any of those kinds of regular collection activities at all. It didn't bill us again. It didn't file appeals. It didn't do anything of the sort. So we ask that you affirm the district court opinion requiring a Medicare payment in order to bring the private cause of DVTA LAX article 3 standing as dissipation. Thank you. Thank you. Mr. Elwood, you have some rebuttal time remaining. Thank you, Your Honor. I'll begin where Ms. Drummey ended, talking about the DVTA's supposed failure to pursue other remedies, including submitting and asking pretty please for additional money. To begin with, that is differentiation. I say that is differentiation in any manner. If you say everyone else, we pay the full amount, but for Medicare, you have to bow and scrape. If you are Medicare eligible because of ESRD, you have to come and bow and scrape and do the separate appeal procedure, even though we recognize, as Ms. Drummey said, you are sick and doing dialysis three times a week. There is no statutory requirement they have to do that. I think it is unrealistic to expect that the patient should have to do that. Secondly, with respect to the Medicare manual, I ask you to look at page 17 of a reply brief. The sections that she read simply do not support it. There are other portions of the plan that say people are in noncompliance or failing to comply with the prohibitions on differentiation and taking into account. Those portions do not say anything about Medicare having to pay first. Again, I would point you to, I sound like a broken record, but 54 Federal Register 41718. They discuss the whole issue and there is nothing in there about Medicare having to pay first. That is authoritative guidance from the agency. They have never walked away from that. Now, Judge Fletcher mentioned the circuit law on point. I just wanted to point out specifically the Sixth Circuit case, which I think is the most on point, simply is not on point and is not persuasive. That is the biomedical applications case that was mentioned by Mr. Short during the last argument. First, I want to point out that whatever it stands for, it is based on an error. Let me point you to page 286 of the opinion that says that, quote, subparagraph 2A instructs when primary plan violates that prohibition on differentiation and accordingly fails to pay for treatment, Medicare may make a conditional payment for the treatment. That is, again, 286. They read 2A exactly backwards. They say 2A permits payment when, as Virginia Mason says at page 27 of the brief, 2A prohibits payment. To begin with, it is based on a legal error. Secondly, that case involved a different question whether, quote, for a private insurer to be liable under the private cause of action, the private insurer's responsibility to pay must be demonstrated, e.g., via a prior judgment or settlement prior to the litigation, unquote. That is at page 279. They were facing a very different question. Every statement they say is in response to that. They say, no, you don't have to actually have to reduce it to judgment. They say, you are liable if the primary plan fails to pay and Medicare steps in. Sure, that is enough, that is sufficient for liability, but that doesn't say anywhere that it is necessary. That is what Judge White's concurrent says. She says that, quote, a primary plan fails to pay in accordance with 1 and 2A when it terminates a plan holder's coverage and thereby induces, oh, I'm sorry, that's not it. I'm one down. It simply provides, this is the quote, it simply provides for a private cause of action when a primary plan fails to provide payment due under paragraph 1, leaving Medicare next in line to pay. So I think that that case doesn't actually hold for anything, not that it would be binding on this case. Counsel, before, sir, before you run out of time, could you address the Article III standing question? Sure. To begin with, we have, there are two types of standing. First, we have what they should have paid if they weren't taking Medicare eligibility into account. So they paid us less than they should have. That is, you know, that is from the first case that probably was brought in federal court, that is standing. We were injured. They paid us too little. The other side is, I think, fully answered by Springer v. Cleveland Clinic. That case said, you know, if you're on the hook for balanced billing, you know, we don't have to collect it. You don't have to actually present a bill. Well, we wouldn't have to actually reach that, though. If the first issue gives you standing, standing exists and only one. That's correct. I think we have standing too deep. It's covered in our 28-J letter that we filed. Now, let me see here. Oh, well, I think that the only other thing I will say is that, again, when the other side argues that there's a reason why Congress wrote a statute to cover for mistaken payments, the government has a cause of action then. Under our reading of the statute, both I thank the court for this time, and we ask you to reverse. Thank you, counsel. The case just argued is submitted, and once again, we appreciate very much the helpful arguments from both counsel.
judges: Graber, W. Fletcher, Kobayashi